and also the County of Los Angeles May it please the Court, Timothy Coates here on behalf of the County of Los Angeles and Dr. Garthway and if I could I'd like to reserve four minutes of my time for rebuttal. This case is kind of a snapshot of the health care crisis in the entire country and it's the question of who has the obligation to pay for that. It's all well and good to order a public entity to keep a hospital open or to provide care but it can't be separated from the fact that there has to be the means to be able to provide that care, the financial means. And I think what we have here is a situation in which there are no easy choices and I think that as this case illustrates and the companion case illustrates I think this is the type of situation that's difficult for a court to effectively intervene in and provide meaningful relief. And I think it's why it's critical that in looking at the injunction here that the court keeps strongly focused on the express legal entitlement to relief of the plaintiffs and not be caught up in what I think everyone would agree is a terrible situation. It would be good to provide the care that the plaintiffs want. But there's circumscribed very narrowly the power of the federal courts to intervene here and it's the basis of the legal claim that I think that's particularly true with respect to the first claim that's the basis of relief granted by the district court here. And that is relief directly under the Medicaid Act. And I think as we note in the brief the confusion is or at least what the sidestep in the district court has done is essentially said that the county as a provider has a requirement under Medicaid to assure a particular level of services, of adequate services. And I think as we note when you look at the Medicaid system, that is an obligation that the state has. And even there the state's obligation is limited to providing reimbursement rates that are sufficient to attract providers into the market for Medicaid care to Medicaid beneficiaries. And one of the real mischiefs in the district court's order here is in requiring the county to keep Rancho open during a period of time. One of the things it says is or until care, comparable care is provided at other hospitals, including private hospitals in California, in the local Los Angeles area. And that's not something that the county of Los Angeles can control because we don't set reimbursement rates for Medicaid. We cannot meet that barrier because it's constantly shifting. We cannot assure private participation. And I think what the district court has done, and given I guess the frustration of private providers, that private providers haven't picked up the slack, is to say that as a provider of last resort county you're going to step in here and do that. But you contracted with the state to provide these services. But you – exactly. But the legal obligations that you have as a provider are very narrow. I mean, they're specifically spelled out. And none of them talk about measuring the adequacy of care vis-à-vis the private sector. Those are the ones that talk about the regulations that deal with the state. Well, that's a bailout if the private sector does it, then the government doesn't have to do anything, for God's sake. But you contracted to provide these services. Within narrow obligations. I mean, there are obligations in front of providers. I mean, there's no question about that. And some of them I think are more specifically at issue in the Harris case about discharge planning and the like. But the one that we're talking about with the district court granting relief under the Medicaid Act here and is incorporated in the injunction itself is that notion that we have to provide services comparable to those that will be provided to private patients in the private sector. I mean, that is in the language of the injunction. It's one of the means for compliance. And that is not a test that is imposed by the Medicaid Act on any provider. And those are, I mean, it's in there, but it's in there with respect to the state. And again, it's in there with respect to the state only in terms of setting reimbursement levels that are sufficient to hopefully bring people from the private sector in to provide care. Can I back up for just a minute? Sure. I want to, I've got two questions. And the second one is the one that you're answering. But I've got a prior question. And that is, do you contend that you have no judicially enforceable obligation under Medicaid? Or do you contend differently that you have a judicially enforceable obligation? It just doesn't extend as far as the injunction, which is then the second question. Exactly. Yeah. Exactly. Exactly which, I mean. But there is no question that the Medicaid provisions do put restrictions, requirements on providers and the county as a provider. And it's a judicially enforceable obligation in this court under federal law? It could be. I'm not sure whether it would necessarily be for injunctive relief. It depends on what's sought. But, yeah, if someone suffered an injury, for example, in a straight-up tort suit and had a federal right in enforcing it through Section 83, yeah, they might be able to enforce that. So your question, then, is not that you're not arguing you're out from under any obligation under Medicaid. You simply say it doesn't go as far as the injunction. That's right. But you have to look at it. You have to be very specific at where we're finding that, quote, obligation. I mean, there are very particular regulations that apply to providers. But I think this general notion, and it is in the injunction, that you measure the county's compliance under Medicaid the same somewhat as you do the state, which is, gee, are you providing or assuring care at a level that's available to the private patient, the private sector? Well, then, what is your obligation to provide at what level? Well, it's the provider obligations. I think the most specific one that we've even had briefing on here, the ones that have gotten more play in the Harris case, or, for example, discharge planning, for those inpatients that meet the criteria where they need discharge planning. It's a very specific regulation. But that's not the source of this injunction, and it's not in the language of the injunction here in the Roddy case. Yeah, but what level of care is the county required to provide vis-a-vis the private sector? I thought that was the question. Maybe I've got it. Vis-a-vis the private sector, or in terms of measuring whether our care is adequate to Medicaid beneficiaries by, is it as good as we get? In terms of the measurement, the quantity of, or the quality of care. The quality of. What is it measured if it's not against the private sector? Well, it does. The regulatory mandate just speaks in terms of those specific things, the discharge planning. I mean, that's something that's a very concrete regulation that talks about when you need to do that. I don't think there's a provider regulation that says we're going to measure this vis-a-vis the private sector. I mean, there are a lot of standards that apply to what you do in medical care, most of which aren't regulatory, most of which are basic tort law, you know, with regard to the standard of care. If we're talking about regulatory requirements, I think our point is they are very narrow. Give us an example, would you? Be specific. I think the most specific is the discharge plan. I mean, that is a specific provider regulation. It's more at issue in the Harris case. That's the basis of their Medicaid claim here. But that's not what they have pushed here. That is not what you see in the text of the injunction in terms of why you have to keep Rancho open and how you'll be able to close it. When they talk, it just talks to the general level of services, rehabilitation services, that the whole panoply of services offered by Rancho under the Medicaid Act, you have to keep providing them until you can show that somebody in the private sector is doing that. And I think, you know, when we're talking about the level of care, I think, again, it's switching the hat that the county wears and the only hat it can wear under the Medicaid Act, which is as a provider, not as someone who's administrating the program that has to make sure that there's a particular level available to the Medicaid market. So what is the level? What is the level? What's the floor of that level? What's the floor of the level of services that must be provided? Under county, under the ones that are required by the regulations that we are talking about. Here, the narrow one is the discharge planning one. We understand that, but give us a little more detail. No, that's what I'm saying. That's in the universal That's all there is, huh? In terms of that, there is no general amorphous obligation that the county, once it undertakes to treat Medicaid patients, has to provide the full panoply of services that are available to private patients in the private sector. I mean, plaintiffs haven't cited a case that I think it's telling that the cases they do cite are cases that involve the states as administrators of the program. And I think that's, again, because it's the states that have that obligation, not the providers. And bear in mind, again, the county is a public entity Medicaid provider. Do I hear you correctly, sir? You have no minimum requirement of providing services other than on the discharge side by reason of being a provider? Well, you know, there may be other regulations. The ones at issue here, the only ones raised here, have been those that have been pushed in terms of specific things you must do. If we're talking about, again, the way the injunction is framed about level of services comparable to the private sector, you will not find that in anything going to a provider. They haven't cited a case that says that. They haven't cited a regulation that says that. Does the State have a higher level of obligation under your argument than the county? Yes, it has. And what's the State's obligation? Well, the State's obligation, as the case law talks about, is to set reimbursement rates sufficient to provide a level of care available to Medicaid beneficiaries that they could get in the private sector. That's the ideal standard. But how does the State have a higher obligation than you do when you're a provider on contract with the State? Because the State is, because the State's the one who has to fund the State's money. Then you're getting Federal money. That's right. But it's channeled through the State. I mean, the State is the one that sets the reimbursement rates. It determines to set, to spend the money for Medicaid. What, what the district court order does is turn the system on the head. I mean, the county's no different than any other provider. Bear in mind, again, it's not just public entities. When, where does the State's obligation come from? From the Medicaid statutes. I mean, they are the administrators of the Medicaid. Well, okay, I understand that. And when the county agrees in Section 6.5 to conform with Well, there are a number that, I mean, we talk about them, you know, in the brief in terms of the mandatory, the amount of funding that you have to have to attract people from the private sector. I mean, I think it's the mixing apples with oranges, that providers are different than the States as administrators. And the system is geared towards the State as administrator. In fact, I think we even note that one of the things they didn't want the States to do was to try and delegate this responsibility to somebody else. And I think that's really what we have going on here, which is the district court has kind of jumped over the State, because the State's the one that has the obligation to provide reimbursement rates sufficient to get the private sector to step in and take Medicaid patients, and said, county, whether you can pay for it or not, whether you can make, you know, whether you're going to go into a deficit or not, you've got to keep the doors open to these people. Well, simple, this county doesn't have to accept the money. Well, it could opt out. It could opt out in the future. I mean, you could walk away from this case tomorrow. Well, we could walk away at the expense of the entire Medicaid program, sure. But I'm not sure that's a rule that anyone wants to impose on all Medicaid providers. Because, again, there's nothing unique to the county about being a Medicaid provider. I mean, if you want to doom the Medicaid system and have private providers leave, believe me, a case that holds that if you sign on as a provider, you have to guarantee a level of services that looks the same as the private sector, and offer those, whether it's financially feasible for you to do so, no one's going to participate in this program. Well, the level at the private sector, aren't they talking about minimum reasonable medical services? Not talking about what, you know, you would get at some unbelievably, unbelievably able and on the cutting edge of medical science, but basic, reasonable, you know, something that would not be considered malpractice, certainly above the malpractice, the reasonable. Sure. But when we talk about service, it's not just, you know, there are different types of services. A cardiologist gives cardiac care. He doesn't give orthopedic care. You couldn't be a Medicaid beneficiary going to a cardiologist and say, I'd like some orthopedic care. And you need to expand your suite and you need to do orthopedic care because, gosh, I'm a Medicaid beneficiary and I want that. But that's kind of what is happening here, which is we are being told you offer these services, you have to offer the full panoply of services, whether or not you can or not, whether it's financially feasible for you to do it or not. And I submit, again, you look at the case law, you will not find a case that looks like this. And I think it's because the system is geared towards the State as the administrator of the program being responsible for guaranteeing that certain services are provided. But you are a provider, you sign on, it's not in for a penny, in for a pound. There's just no case law that suggests that. And as I mentioned, it would be destructive to the Medicaid system to do that. Again, you want to drive people from the system, that is the way to do it. So that you could give services, let's say orthopedic services, but not give cardiac services. Oh, yeah, private providers. You could rule out a portion of medical services to a wide range of medical assistance for some people on Medicare. That's absolutely true of Medicaid providers, yeah, absolutely. I mean, the Well, yeah, but can the State accept that money and allow that to be done by its providers? The State. That's the State. But, I mean, again, the State's obligation is different. The State's obligation is that funding obligation to fund at levels that people will come in and do the rehabilitation services. Again, I mean, it's the shifting, again, the role of the county from provider to the role of somehow administering the Medicaid program. And what we're saying is the person who controls the funding is the State. You know, we've signed on, but we haven't signed on to this limitless obligation. Again, we don't control reimbursement. We don't sign on to that. What do you sign on for? You sign on to provide the specific services that you set forth in the agreement and that apply to providers. And one of them isn't measuring the standard of your care and the panoply of services that you offer against what's available to private parties in the private sector. I mean, that's just not in the regulatory scheme. And, again, I can't see a case there that even suggests that vis-a-vis a provider. And if I may, I'd like to turn to the ADA issue before I ask for the credit. I'll go to it. But I think, I mean, one thing on the Medicaid Act that I think is kind of telling you is just the last thing is, I mean, it originally was not pled against the county. I don't think they even thought they had this theory against the county. It kind of came in under whole cloth later from the district court. But going to the Disability Act claim, here again, I think you have to look at the specific nature of the claim. What is the benefit that we're talking about that's being denied under the Disability Act? And this is where I think Alexander versus said, in the context of Medicaid benefits, you cannot measure the discrimination by the adequacy of the particular medical care that the person receives. There's a benefit, but the amount of benefit they receive from that particular treatment can't form the basis of a disability claim. And the reason is because, as Alexander points out, and I think as this case kind of illustrates, you couldn't take any action with respect to benefits that might not have an effect on somebody who won't get the same benefit as any other patient because the individual circumstances are so different from patient to patient. So you look at the general benefit and you simply, you don't ask, is it going to have a different impact because this person needs more care? You just ask, is that a benefit available across the board? And here, I mean, I think it's telling the district court's order itself, it talks about the Medicaid benefit as the benefit is adequate medical care. And that is expressly what the Supreme Court repudiated in Alexander because you have that paralysis that sets in because the people running the Medicaid program, you know, a provider, what have you, who's on the front lines doing this, have no means to make decisions on particular care that won't impact somebody who'll say, well, gee, I'm just not getting the same benefit as somebody else. And, I mean, the court's language on this couldn't be, I think, more contrary to what Alexander was talking about. But let me ask you this, and I'm sharpening the facts. These are not quite a description of the facts. Let's say you've got six hospitals in the county, only one of which provides comprehensive services to the disabled. And the state in an effort to, or the county in an effort to save money closes that hospital and that hospital only. Does that come under Alexander? That sounds to me as though that's targeted toward the disabled. Well, no. And here's why. Because those individuals could come to other county facilities to receive other types of care, to receive acute care or things of that. But what happens if there's no showing at this time that the other hospitals are equipped to do that? Well, to provide them with specialized care or to provide them with basic medical care. With the care they need. Well, but see, then you run smack. Because, again, the first thing that Alexander says is you can't define the benefit as the care a particular person needs. I mean, because I'll tell you what illustrates the point. The court says you close Rancho and certain types of rehabilitation services are gone. The county, on the other hand, if it doesn't close Rancho, has to close clinics that may serve other people with different disabilities, not the orthopedic type or the special rehabilitation case. You try and get at Rancho. You have both of And that's the problem that Alexander talks about. You can't sit there between these two because it isn't just the disabled as a class that use Rancho that's an isolated group of disabled people and there are no other disabled people. I think the reality is, as the Supreme Court notes in Alexander, that there are many facets to this. That, you know, making a decision for this type of disabled plaintiff group could have an impact on other disabled individuals. And once you get into that dynamic, you pretty much can't make a reasonable decision under the Medicaid statutes. Yeah, but you've now moved away from my much sharper hypothetical. But your answer to my even sharper hypothetical is you can nonetheless, the county can close the one hospital that has facilities that are useful to the disabled, even though the other five hospitals do not. Well, don't have specialized services. They may have other services that they should have, but not specialized. Sure, they'll treat pneumonia and tuberculosis. They just won't treat disabled people. That's right. And the county can do that? Well, disabled people with tuberculosis or disabled people who require additional care because they have tuberculosis and they're disabled. I think they can treat sick people with tuberculosis. But if somebody comes in who's disabled under the definition of the ADA with some chronic disability, they cannot treat. They're not going to obligate. That's what the remaining. It doesn't fit in with the panoply of what services are offered at that facility. I think that's right. What's right? Because it's the services that are offered. What's right? I lost you on a seat. I'm sorry. That if they come into a particular facility, that facility doesn't have the panoply of services they require because of the particular nature. We offer other services. We offer basic health services, but they come in and say, look, that's not, that doesn't help me. Okay. Doesn't help you. That's what I'm saying. They come, they're coming in. You lose? No. It doesn't help. I'm talking about the individual comes in and says, that doesn't help me. It's, these are the medical services we offer. We offer basic medical care. Best example, we come here and you want a flu shot. Everyone else can get a flu shot. You get a flu shot, you may need special, you go to a clinic, maybe need inpatient care or something else. I think under those circumstances, the benefit is everybody gets a flu shot. If you need a flu shot plus, I think Alexander very clearly says, that's not discrimination. That's Alexander, we pay for 14 days. You need 20. That's not discrimination. The benefit is the 14 days. But the 14 days goes to, well, how long is it going to be rather than to the actual service provided? I'll give you 14 days of service that actually is good service to somebody who's disabled. You know, you may need a little longer, but at least I'm going to, during the 14 days you're in the hospital, I'm going to give you the service that's actually suitable for somebody who's disabled. My hypothetical says, you've just closed the hospital that provides services to disabled, period. You're not giving them 14 days, you're giving them zero days. Well, again, I'm not sure, closing to disabled, closing to disabled for what are considered specialized needs. I mean, it's that you've given them 14 days, but that doesn't know good because they need 20, then the 14 days essentially becomes meaningless. But what about the people who need five days? They need one day, but you're giving them zero. How does that come under Alexander? Because we offer health services. I'll give you 14 days if you've got tuberculosis, but if you're disabled, I give you zero. But see, then that's the, but see, I think it's the mix up as to what the benefit is that's being provided. If they come to us and the benefit is health care, maybe it's acute care at an acute care hospital. And what they're talking about, and I know the court is admitting that, you know, there's no, this is a hypothetical. The reality of the medical, of medical care is people come in for all sorts of maladies. And, and, and, you know, a disabled person comes in, there's no question they have special needs, you know, but there are certain care that we can, you know, come in on an emergency room. Can we stabilize them? Yeah, we can. Can we necessarily provide additional follow-up care that they may need to be, if they're disabled? No. And I don't think we have an obligation to do that. I think that's what Alexander means. And that's why, when the court pushes this hypothetical, gee, there's six hospitals and no disabled at all, no services you could ever use. I mean, that's pretty far out there in terms of the realities of medical care. Yeah. I'm just, I'm trying to understand the, the, the analytic outlines of your argument. I think I have it. Okay. All right. Thank you. Yeah. We'll hear from the Apelli. Your Honor. Well, what, what, what, what, did you work this out in advance? Well, who are you? And who do you represent? I did try to speak with counsel beforehand. There was no injunction issued against Diana Bonta. In fact, the court said there would be no, no relief awarded against Diana Bonta. However, there is suggestions in the plaintiff's briefs that liability could or should be awarded against the state. We are here to preserve a right to present oral argument. If that, if that. Okay. Then, then, then why don't you just have a seat and let's see what happens. Thank you, Your Honor. All right. Good morning, Your Honors, and may it please the court. Jeff Davidson for the Apelli's, plaintiff Apelli's. The preliminary injunction entered by the district court can be affirmed solely on the grounds of the Americans with Disabilities Act. And on that point, the problem with the oral argument that we've just heard, and indeed much of the appellant's briefing, is that it ignores that the district court expressly found as a matter of fact that if Rancho Las Amigas Hospital is closed, children and adults with severe disabilities of the type typically treated at Rancho will be excluded from and denied the medical services that we're talking about, that the district court was talking about, are first of all, essential, in many cases quite literally, to keep these people alive. And in all cases, to give them some semblance of a life. But moreover, the medical services that we're talking about include those which the county now supplies and will continue to supply at other facilities to people without disabilities, as well as some specialized services necessary to give people with severe disabilities meaningful access to the medical treatment otherwise provided by the county to people without such disabilities. Now the district court, the factual record in that regard, is summarized in the district court opinion at pages 6 and 7 and 13 and 14, and in our brief at pages 12 through 17. But if I could pick out just one example, one summary for the court, I would respectfully refer the court to the declaration of Dr. DeBoard, high county official, number two person at Rancho, assistant chief medical officer, in volume, the excerpts of record tab 19 beginning at page 46. Dr. DeBoard testifies that ventilator dependent people, if Rancho was closed, ventilator dependent people, and those with muscular dystrophy, those with spina bifida, will receive no outpatient medical care of any kind, anywhere in the county. That people with spinal cord injuries will not receive outpatient urology or cardiology treatment. That people with severe disabilities of all kinds will not receive outpatient gynecology, dental, ear, nose, and throat, or pediatric care. Now those are all medical services that the county does now provide and will continue to provide to people without disabilities at other facilities in the county. And as Dr. White, the chair of the Department of Emergency Medicine at White Memorial Hospital said, it's outrageous to close Rancho, to pull these people out of Rancho and dump them into other county facilities. Those other county facilities simply can't handle them. Now in this state of the record, an extensive, and for a preliminary injunction, unusually well-developed, 20,000 page factual record, the district court's findings of fact in this regard are assuredly not clearly erroneous. And accordingly, the preliminary injunction is not an abuse of discretion, because those facts establish a violation of the ADA and Section 504 of the Rehabilitation Act, as the district court correctly held. And as I indicated, this court can affirm solely on that ground. In looking at whether the district court's preliminary injunction was an abuse of discretion, it is important and legally significant to note that the enjoined conduct of the injunction is not an across-the-board cut in budgets, or in staffing levels, or in bed counts at all county facilities. Nor is it an across-the-board cut in a particular benefit or medical service to all county residents, whether or not they're disabled, such as the situation in the Alexander case referred to earlier. Here in sharp contrast, although there were some service reductions proposed at some other county hospitals, the only hospital being closed is Rancho, the only county hospital that does and can provide medical treatment of all kinds to people with severe disabilities. And as the district court correctly found and noted, that's in a historical context of the county's own decision to concentrate medical services for people with severe disabilities, so that to decide to close it now necessarily means that a great many of those people, according to the factual record here, will not receive necessary essential medical services, including services of the type that the county will continue to provide to others at other locations. This is very much, in this respect, like the Dreher Park decision out of Florida. This exclusion from, this denial of benefits of county medical services and medical treatment reimbursed by Medicaid is unlawful under the ADA and the Rehabilitation Act. In fact, it constitutes outright discrimination. It is discrimination on its face, in that it specifically targeted a hospital for the severely disabled. It is certainly discriminatory in its impact. As the district court found as a matter of fact, the impact here is vastly disproportionate on people with disabilities. And under decisions like this court's decision, the Crowder case, discriminatory impact constitutes unlawful discrimination. It is discriminatory in its refusal to provide or to make reasonable modifications or accommodations necessary to give meaningful access to county medical services. And under decisions like the Second Circuit's decision in the Henrietta D case, that constitutes an illegal act under the ADA and the Rehabilitation Act. In looking at whether, and also looking at whether the district court abused its discretion in entering this injunction, I think it is also very important to note and to recognize the district court's attempt to craft a carefully limited and flexible order. After all, the district court injunction, the preliminary injunction, does not necessarily and absolutely require that Rancho remain open. The county could close Rancho next week, provided only that it made a demonstration that people with severe disabilities had the same access to essential medical services that the county otherwise provides. And as the district court noted, it can do that at any time. The district court noted in its decision that the injunction was entered because the county did not make such a factual showing down in the lower court. And now, since that preliminary injunction has been entered, the county has had an additional almost seven months, since the PI was entered, to go back to the district court and now make that showing. And they have failed to do so. They haven't, of course, as the record shows, because they can't. The plain fact is that closing Rancho will deprive people with severe disabilities of essential medical care, including the without disabilities, and that will cause irreparable harm, quite literally, including death. Given the balance of harms and the clearness of the result under the Disabilities Act and the Rehabilitation Act, the preliminary injunction should be affirmed. And I have some questions from the court. That's my question. I'd be interested in pursuing the difficulties we were having with respect to the Medicaid program. Let me start from your adversary's position. He contends that the obligation of the county as provider is narrower than the obligation of the state. In a general and abstract sense, do you agree that that's right? As a general abstract sense, in terms of providers as a general category, I would say that's true. Why in this circumstance does the provider have an elevated, at least I assume your argument is in this circumstance, the county as provider owes more or has a distinctly larger judicially enforceable obligation than, say, a private provider? I have two responses to that. The first one is that I do believe that the county here has a particularly heightened responsibility. After all, the county is not just another Medi-Cal provider like some individual doctor or some small group. The county is a large governmental institution that operates a very extensive medical system. It receives Medicaid funding far and above what the normal medical provider has received or does receive, especially given the county's billion-dollar Medicaid waiver demonstration project for which it agreed to heighten standards of care. It is operating, in essence, as the agent of the state, we would submit even as a joint venture of the state for federal Medicaid purposes, has contractually committed itself to provide an actual, the commitment in the contract is to provide all necessary and appropriate medical services. That's the obligation that they undertook to do. Now, they agreed to do that under federal law? That's to say that that's not part of the ordinary Medicaid program, correct? It is a Medicaid waiver demonstration project, so it's a special program for which the state, I'm sorry, the county received special additional funding. And is that obligation under that special program based upon state law of contract? Is that federal Medicaid law? What's the nature of that law? I believe that the obligation comes from two places. I believe that it does come from state contract law because the county contracted to do it, but I think it also comes from the fact that here it would be fair to say that the county in these circumstances where the whole county system is operating pursuant to this funding on this special Medicaid waiver is operating as just the agent of the state for the purposes of the federal Medicaid program. And that really brings to my, me to. And let me ask you this. I think I know the answer, but I don't recollect having read in the district court's order any reliance on this special program as the basis for its order. Is that right? It does specifically refer to the county's agreement to provide under the terms of their contract with the state. It notes that there is this special program. Where is that now? Page seven, I believe, of the court's opinion. It notes that there is this special funding that is given. And that's in the fourth volume of the records of record at the beginning of page or tab 70 on page seven. There's a specific notation to that special funding that the county receives. But I would note this, the second. Well, that's the additional 900,000. Yeah, 900,000, yes, sir. Yeah. That's correct. But when I get to compliance with Medicaid requirements, that's, that doesn't show up again in the court's. This kind of looks like background to me. It's hard for me to read it. I mean, I'm not sure. But here's the, and I think this goes to the second point. Note that the district court did not say that the state was not liable or the state was not, was in some sense off the hook. Indeed, what the district court specifically said was merely that it would not issue an injunction against the state. We have cited case law at, in our brief, pages 51 through 57, which indicate that there are cases out there which say that an injunction against the state would be binding against the county, even if they weren't named. Here, the only difference is they were named, which only with the practical effect of which we just gave them a greater opportunity than in the cases that we cite. Has the state, has the state itself been named or is it a state officer? Obviously, I'm worried about the 11th Amendment. I believe it's a state officer. Okay. Yeah. Would be actually, and I will show you that again. Okay. Yeah. That's okay. I'll try it. I just want to make it clear. The real problem with the county's argument on the Medicaid front is really it's just simply, when you really cut to the bottom of it, it's an argument that the state ought to be a party to this injunction as well. Not that they're off the hook, because they would be bound by an injunction according to the authorities that we've cited in any event, but that the state should also be a party to this injunction. Obviously, that's what we asked for down in the lower court, and we do believe that when it's all said and done, at the end of the day, when we come to time for final relief, given the Medicaid violations which the district court found in its opinion, the state, as the district court says in the preliminary injunction opinion, will have responsibility and that some relief should and should not be and will be entered against it. But this isn't a final judgment. This is a preliminary injunction to preserve the status quo until we can get to that stage. And as is often true of preliminary injunctions, the relief afforded was tailored as narrowly as possible while still preventing the threatened harm and accordingly directed only at the party necessary to obtain the relief that was necessary. As the state vigorously argued in the court below, the county runs Rancho. They're the ones that write the paychecks. They're the ones who can keep it open. They're the ones that made the decision to close it. And so the district court enjoined the county from closing Rancho, at least until the county or the state or somebody can come in and demonstrate that the same access to medical treatment that's essential for these people will be provided somewhere in the county. What level of medical treatment has to be provided for? That's what your adversary was talking. He said there's no regulation as to anything except the discharge. And so he said it's the injunction is fictitious because it doesn't say what level you're talking about. Well, first of all, under the ADA and the Rehabilitation Act, it's what you're talking about. But under Medicaid, I think we would submit that under the more recent case law, the proper definition would remain what the county itself has undertaken to provide in its own Medi-Cal contract, which is all necessary and appropriate medical services. And that requirement also comes not only from the equal access provision, which is the only one that the council wants to talk about, but also, for example, from the timeliness, the promptness of care requirement of the Medicaid regulations as cited at page 47 of our brief. So I think there is even a regulatory basis for that. After all, the Alexander case, it's an 85 case, and there's a lot of decisions that have been decided since then, and it was merely one where the Supreme Court decided to affirm an across-the-board, facially neutral cut in benefits against an argument that people with disabilities were entitled to adequate medical care, which the Supreme Court found is too amorphous and individualized a standard to apply. But the phrase now being used, this necessary and appropriate medical care, as exemplified in the very contract that the county has signed, has almost become a sufficiently clear and understood today that's included as a contract term. And people understand what that means. It's necessary medical care. And it gets away from this, I think, false issue of, quote, special services. Everybody gets specialized services to some extent. As the Alexander court noted, you can define away the problem just by defining the issue in a certain way, but there must be some minimally adequate necessary medical care, some minimal special accommodation to people with disabilities that must be made. Thank you.  Your Honor, the state would just like to, excuse me, appellee Diana Bonta would just like to clarify that in this preliminary injunction motion, the plaintiff sought to keep Rancho open. The state does not have any control over keeping Rancho Los Amigos open. Rancho Los Amigos is operated and owned by the county. Therefore, the district court properly concluded that no relief could be awarded against Director Bonta. The court, however, did not find that there were any violations by the state. And in fact, it did not address whether there were any specific violations by the state. Any issue as to whether there were violations by the state is not proper for this appeal. There was no appeal taken with respect to the There are suggestions in the briefs that the state should be held liable, Your Honor. Well, yeah, but we hear appeals from orders and judgments, not from briefs or statements. When that issue was before us, if it ever is, then we've got something to talk about. Thank you, Your Honor. We're just here to preserve the record. And if an advisory opinion was issued to the district court regarding the obligations of the state, we wanted an opportunity to do that. All right. Any rebuttal? You're over your time, but we'll give you a minute. Two things I think are telling. One on the ADA. And it's critical to say, to examine again, what is the benefit that we are talking about? Keep the eye on the ball on that. And what we heard, I think, was kind of a tacit admission that Alexander is troublesome for them, because Alexander clearly says you cannot define that benefit as necessary care. That is how it is defined in the district court order. And it's essentially a pitch, the law has changed since Alexander, this court should change it. And I submit the court is bound by Alexander. Well, how do you justify the fact that this is a cut in what the record appears to be, people who have essential, certain essential needs? It's not a cut of everyone receiving care is cut 10 percent. Well, but let me tell you, I mean, they keep saying it's just Rancho. It's not. I mean, there are a bunch of us. We, you know, reduced beds at County USC. We'll hear about that later. We reduced clinics. I mean, these are across the board decisions being made in the entire county health care system. There's no question about that. I mean, that's, you know, does Rancho have particular impact on them? Yeah, it does. But as I said If that's so, how come you don't come within the following language from Alexander? This is the court saying, but the regulation that they sustain does not do. The court says in Alexander, the new limitation does not invoke criteria that have a particular exclusionary effect on the handicap. I think we've got a finding, a fact from the district court that this proposed closure does have a quote particular exclusionary effect. Isn't that right? Isn't that what we have as a factual finding? Well, the factual finding is defined by the court's erroneous legal standard, which is, I'm finding there's a denial of necessary medical care. That's what pollutes it from the start. When they talk about the specific services now being denied that aren't offered to other county patients, they're specific services to the disabled. I mean, they talk specifically about spinal rehabilitation. People at other county facilities who don't need spinal care, obviously they're not going to get those services. And I think that's the mischief here. It is still being defined as what these particular plaintiffs need for necessary medical care. All right. Thank you. Thank you, Your Honor. We'll call the next case. Mm hmm. Well, when will everybody get seated? All right.
judges: Pregerson, Cowen, W. Fletcher